Richard GURFEIN, et al.

v.

SOVEREIGN GROUP, et al.

Civ. No. 92–2083.

United States District Court,
E.D. Pennsylvania.

June 4, 1993.

---

6. Plaintiff's complaint was filed November 16, 1992.

896

Arnold Levin, Levin, Fishbein, Sedran &
Berman, Stuart H. Savett, Savett, Frutkin,
Podell & Ryan, P.C., Laurence S. Berman,
Levin, Fishbein, Sedran & Berman, Philadel-
phia, PA, Douglas W. Lohmar, Jr., Beigel &
Sandler, Chicago, IL, for plaintiffs.

Denis F. Sheils, Kohn, Savett, Klein &
Graf, P.C., Philadelphia, PA, for defendants.

*OPINION*

LOUIS H. POLLAK, District Judge.

Plaintiffs,[1] a group of individual investors, purchased security interests in two limited partnerships—the Sovereign Realty 1984–VII, Ltd., d/b/a The Sovereign Building, a Pennsylvania limited partnership ("the Sovereign Partnership") and Sovereign Realty 1985–2 Ltd., d/b/a Crestwood Apartments, limited partnership ("Crestwood Partnership")—organized and promoted by defendants, Sovereign Group, Inc., Butcher & Company, Sovereign Realty Management, Deilwydd Properties 303–A, Ltd., Lyle W. Hall, Jr., John S. Seal, Jr., Deilwydd Properties 603–A, Ltd., Butcher & Singer, Inc., B & S and Sovereign Management,[2] and Deilwydd Properties 304–A. Plaintiffs from Exhibit A of the amended complaint ("A-plaintiffs") purchased securities in the form of cash and notes in the Sovereign Partnership, while plaintiffs from Exhibit B of the amended complaint ("B-plaintiffs") purchased securities in the form of cash and notes from the Crestwood Partnership.

In connection with the above securities transactions, A-plaintiffs allege that Sovereign Group, Inc., Butcher & Company, Sovereign Realty Management, Deilwydd Properties 303–A, Ltd., Lyle W. Hall, Jr., John S. Seal, Jr., Deilwydd Properties 603–A, Ltd., and Butcher & Singer, Inc. ("Sovereign defendants") violated § 10(b) of the Securities

Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b–5 promulgated thereunder (Claim I). In addition, all plaintiffs allege that defendants: engaged in a pattern of racketeering activity in violation of RICO, 18 U.S.C. §§ 1961 et seq. (Claim II); and engaged in conduct that was fraudulent (Claim III), negligent (Claim V)[3], and in breach of their fiduciary duty (Claim VI).

Presently before the court is defendants' motion to dismiss plaintiffs' claims pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6). For the following reasons, defendants' motion shall be granted in part and denied in part.

### I. *Standard of Review*

■ A claim should be dismissed under Fed.R.Civ.P. 12(b)(6) only where, taking all allegations of the complaint as true, and making all reasonable inferences in the complainant's favor, "it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of their claim which would entitle them to relief." *Wisniewski v. Johns–Mansville Corp.*, 812 F.2d 81, 83 n. 1 (3d Cir.1987) (citations omitted); *see also Unger v. National Residents Matching Program*, 928 F.2d 1392 (3d Cir.1991.) The standard is the same for RICO and non-RICO claims. *Rose v. Bartle*, 871 F.2d 331, 355 (3d Cir.1989).

It should be noted that defendants have submitted a number of exhibits with their motion to dismiss.[4] Among defendants' ex-

---

1. Richard Gurfein, Mark B. Wiesen, Jeffrey S. & Ronnie Dennis, Dr. Richard M. Sweet, Dan M. Westphal, M.D., Dr. and Mrs. Melvin Bubrick, Howard Ducat, Thomas Ungar, David Horberg, Kurt E. Reinsberg, Robert Kaminsky, David M. & Judith Levitan, Sidney Newman, Ralph R. Feuerring, F.G.N. Associates, Henry M. Liptak, W.P. Magee, Jr., Jonathan S. & Dale H. Jacobs, Neil M. & Leslie Bialkin, Stuart Bregman, Martin Greenfield, Samuel M. Hochberger, Bernard Schwartz, William T. Humphrey, Vincente A. Alcantara, M.D., Wayne R. Carney, Harvey W. Roberts, III, S. Scott & Roslynn R. Nicholas, William J. Flood, Marc Silverman, Geno Dibagano, Allen Rosechine, Martin Vogelfanger, David Gilbert, David Cole, George I. Buckler, Raymond Stewart, Jr., Robert L. Farmer, Ida Mae Westfall, Donald H. Snyder, Jr., Arnold Fader, Elaine Paul, Alvan Schrader, Robert Rosenberg, William E. Reisinger, Jr., and Lyle Delwiche.

2. Although listed in the caption to the amended complaint, it would appear that the reference to

"B & S and Sovereign Management" is a mistake by plaintiffs and should be amended. Defendants' motion to dismiss suggest that no such entity exists. Looking at plaintiffs' descriptions of defendants, I note that "B & S" is their abbreviation for Butcher and Singer, Inc. The origin of "Sovereign Management" is less clear.

3. The amended complaint has no Claim IV.

4. Defendants have provided the affidavit of Denis F. Sheils, Esq. to which is attached copies of the following:

(1) the amended complaint filed by plaintiffs listed in Exhibit A against the Sovereign Defendants in the Southern District of New York in the action *Gurfein, et al. v. Deilwydd Properties 303–A, Ltd., et al.*, 90 Civ. 0817 (WCC) ("the New York action").
(2) the October 11, 1991 Opinion and Order of Judge William C. Connor, 1991 WL 221071, with respect to the New York action.

hibits are the Sovereign Partnership offering memorandum, the Crestwood Partnership offering memorandum and the September 1989 Sovereign Partnership Information Statement. Plaintiffs allege in their complaint that defendants made a number of misrepresentations and omissions in these three documents. However, plaintiffs did not themselves attach the documents to their complaint.

█ In general, a court may not consider materials outside the pleadings and the briefs without converting a motion to dismiss into a motion for summary judgment. Fed. R.Civ.P. 56. However, since the above three documents are integral to the plaintiffs' complaint, I believe that they are properly reviewable on a 12(b)(6) motion. "A contrary holding would enable plaintiffs to survive a 12(b)(6) motion where the terms of the document on which the claim is based would render the complaint insufficient as a matter of law, simply by refusing to attach the document to the complaint." *Goodwin v. Elkins & Co.*, 730 F.2d 99, 113 (3d Cir.1984) (Becker, J., concurring).[5] *See In re Donald Trump Casino Securities Litigation*, 793 F.Supp. 543, 546 n. 1 (D.N.J.1991). *See also I. Meyer Pincus & Assoc. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir.1991); *Romani v. Shearson Lehman Hutton*, 929 F.2d 875, 879 n. 3 (1st Cir.1991). While I will refer to the three documents mentioned, as well as to the published opinions from the district courts from the Southern District of New York and from the District of New Jersey, I find it unnecessary to refer to the other materials submitted by defendants to decide the present motion.

(3) the March 16, 1992 Opinion and Order of Judge William C. Connor, 1992 WL 58841, with respect to the New York action.
(4) the Sovereign Partnership Private Placement Memorandum.
(5) the complaint filed by the plaintiffs in Exhibit B of the amended complaint against defendants in the Illinois State Circuit Court of the Twelfth Judicial Circuit, Will County, Illinois, entitled *Cole, et al. v. Deilwydd Properties 304–A, Ltd., et al.*, Cas No. 91 L 4625 ("the Illinois Action").
(6) the October 21, 1991 Order in the Illinois action.

## II. *Facts*

As explained by plaintiffs, defendants formed a number of limited partnerships during the early 1980's. These limited partnerships would purchase or lease property, offering for sale units of the property to interested investors. At that time, investment in real estate was a rather safe investment, providing opportunities for property appreciation, profit and tax benefits.

According to plaintiffs, defendants played the following roles within the limited partnerships:

(a) Deilwydd Properties 303–A, Ltd. ("303–A") is a Pennsylvania limited partnership. 303–A acted as general partner for the Sovereign Partnership. 303–A's general partners were defendants Lyle W. Hall, Jr. and John S. Seal, Jr.

(b) Deilwydd Properties 603–A, Ltd. ("Contractor") is a Pennsylvania limited partnership. Deilwydd Properties 603–A acted as the contractor for the Sovereign Partnership. The Contractor's general partners were also defendants Lyle W. Hall, Jr. and John S. Seal, Jr.

(c) Deilwydd Properties 304–A ("304–A") is a Pennsylvania limited partnership. 304–A acted as general partner for the Crestwood Partnership. 304–A's general partners are also defendants Lyle W. Hall, Jr. and John S. Seal, Jr.

(d) Lyle W. Hall, Jr. ("Hall") acted as a general partner of 303–A, 304–A and Contractor.

(e) John S. Seal, Jr. ("Seal") acted as a general partner of 303–A, 304–A and Contractor.

(7) the Crestwood Partnership Private Placement Memorandum.
(8) The information statement provided by the Sovereign Partnership in September 1989.
(9) *Kushner, et al. v. D.B.G. Property Investors, Inc., et al.*, 793 F.Supp. 1161 (S.D.N.Y. April 30, 1992 and as amended 1992).
(10) *In re Donald J. Trump Casino Securities Litigation—Taj Mahal Litigation*, 793 F.Supp. 543, 1992 U.S.Dist.LEXIS 8323 (D.N.J.1992).

**5.** The majority in *Goodwin* declined to address the question of whether documents integral to a complaint but not submitted by the plaintiff can be considered.

(f) Sovereign Group, Inc. ("Sovereign") is a Pennsylvania corporation and parent company of Sovereign Realty Management.... Sovereign is the parent company of Sovereign Partners, Inc. which owns a 50% interest in 303–A and 304–A.

(g) Butcher & Company ("Butcher") is a Pennsylvania corporation and is the parent company of Sovereign. In addition to Sovereign Group, Inc., ... Butcher and Singer, Inc. is a wholly owned subsidiary of Butcher....

(h) Butcher and Singer, Inc. ("B & S") is a Pennsylvania corporation and a wholly owned subsidiary of Butcher. B & S acted as the selling agent for both the 303–A and 304–A partnership[s].

(i) Sovereign Realty Management ("Sovereign Realty") is an unincorporated subsidiary of Butcher. Sovereign Realty acted as the management company for the 303–A and 304–A projects.

Amended Complaint ("Am. Comp.") at ¶ 7. This case involves defendants' conduct with respect to two of their supposedly many limited partnerships: the Sovereign Partnership and the Crestwood Partnership. I will address each transaction in turn.

A. The Sovereign Partnership

The Sovereign Partnership, in which only the A-plaintiffs invested, was formed "to acquire, renovate and operate, as an office and retail complex, four buildings located next to each other in Philadelphia, Pennsylvania." Am. Comp. at ¶ 20. The goals of the partnership were to preserve the partners' capital contribution, garner a return on the investment once the project began operating in 1989, appreciate the value of the project, and receive tax benefits. Am. Comp. at ¶ 22 (citing the Private Placement Memorandum distributed by the Sovereign Partnership ("Sovereign PPM") in connection with the sale of the property units).

The renovation of the Sovereign buildings was supposed to commence in 1984 and be completed by 1985. Am. Comp. at ¶ 21. Defendant Deilwydd Properties 603–A, Ltd. was

hired by the Sovereign Partnership as the contractor responsible for the renovation. Under the construction contract, the contractor was responsible for the design and execution of all renovations, and would pay "all project costs" as defined in the contract. Am. Comp. at ¶ 25.

The construction contract, affixed as an appendix to the Sovereign PPM, also provided that the renovation was to be done for the fixed price of $10,550,000. Am. Comp. at ¶ 26. Accordingly, the Sovereign Partnership acquired a $12,000,000 loan to finance the project. Am. Comp. at ¶ 26. A-plaintiffs explain that they distinctly relied on defendants' representation that the construction costs would be fixed in deciding to invest in the partnership. Am. Comp. at ¶ 27.

However, not atypically, the construction costs exceeded expectations and the contractor refused to complete the renovation for $10,550,000, claiming that the contract did not contemplate "finishing" costs. The Sovereign Partnership agreed and permitted an increase in construction costs. The Sovereign Partnership was forced to negotiate a new loan in 1987 for $18,000,000—50% more debt than plaintiffs originally expected to incur. Plaintiffs contend that the Sovereign Partnership was not in a sufficiently strong financial position to service the increased debt. Yet, defendants failed to inform the investors of the threatened state of the partnership.

About two years later, though, in July 1989, the Sovereign Partnership did inform plaintiffs of the partnership's "dire financial straits." Am. Comp. at ¶ 32. In addition, defendants told its investors that Seal and Hall were being replaced as the general partners of 303–A, "and as a requirement for the change, the limited partners [of the Sovereign Partnership] would be forced to relinquish a substantial portion of their interest in the limited partnership." Am. Comp. at ¶ 32.

On September 18, 1989 Butcher sent a letter to the general partners, containing an information statement and mutual release and consent form.[6] This packet of materials

---

**6.** This court assumes the "general partners" who received the letter were the general partners of

303–A—Seal and Hall.

warned investors that failure to agree to the replacement of the general partners and to sign a general release would result in the Sovereign Partnerships' insolvency and would possibly subject the limited partners to substantial recapture of income taxes. Am. Comp. at ¶ 33.[7] According to plaintiffs, the information attributed the Sovereign Partnership's economic hardship to the softness of the real estate market at the time. Am. Comp. at ¶ 34. Finally, plaintiffs allege that the Sovereign PPM, the letters to investors and the information statement contained several misrepresentations and omissions and that plaintiffs relied on these misrepresentations and omissions both in their initial decision to purchase an interest in the partnership and in their later decision to relinquish a portion of their interest in the partnership to a new general partner. Am. Comp. at ¶ 42.[8]

## B. The Crestwood Apartment Project

The Crestwood Partnership was "organized to acquire and operate a 267–unit apartment complex located in Mesa, Arizona." Am. Comp. at ¶ 43. The goals of the partnership were to preserve the partners' capital contribution, to appreciate the value of the project, and to receive tax benefits and cash distributions. Am. Comp. at ¶ 44 (citing the Crestwood Apartment Private Placement Memorandum ("Crestwood PPM") distributed to investors in connection with the sale of the property units).

According to plaintiffs, these goals could only be achieved if the Crestwood Partnership held the land for several years. During those years, the partnership would be responsible for certain monthly expenses and debt service payments. In order to assure investors that the Crestwood Partnership would have sufficient incoming income to cover their costs, the partnership hired the accounting firm of McGlarrey, Henderson and Pollen to prepare income projections regard-

ing revenues and expenses. These projections, included in the Crestwood PPM, concluded that the partnership's receipts would cover the expenses. Am. Comp. at ¶ 48.

Now, plaintiffs contend that the assumptions used to create the projections were unreasonable. A good portion of the Crestwood Partnership's revenues would come from apartment rentals. In making the partnership's financial projections, the accounting firm assumed a vacancy/rent loss rate[9] of 5%. According to plaintiffs, the vacancy/rent loss rates for the Phoenix metropolitan area—which includes Mesa—ranged from 6.8% to 10.8% in 1984. Am. Comp. at ¶¶ 51, 53. In that the financial projections for the partnership served to predict the ultimate viability of the Crestwood Partnership project, plaintiffs allege that they relied on them in the decision to purchase their interests.

### III. Procedural History

This is not the first time the plaintiffs have brought suit against the defendants with respect to the Sovereign or Crestwood Partnerships. On February 1, 1990 A-plaintiffs sued the Sovereign defendants in the Southern District of New York. According to plaintiffs, "the allegations in that [New York action] Complaint are essentially repeated here in this Amended Complaint." Plaintiffs' Mem. of Law in Opp. to Defendants' Motion to Dismiss ("Plaintiffs' Opp.") at 16. The Sovereign defendants moved to dismiss the complaint on the grounds that the forum selection clause in the Sovereign Partnership Agreement required that the case be heard in Pennsylvania. The district court agreed and dismissed the case on October 4, 1991. Plaintiffs' Opp. at 17.

On April 4, 1991 B-plaintiffs filed suit concerning defendants' conduct in the Crestwood Partnership project in the Illinois State Circuit Court of the Twelfth Judicial Circuit. The claims against defendants sounded in fraud, negligence, and breach of fiduciary

7. The Amended Complaint does not state when or if the information was ever mailed to the limited partners.

8. Plaintiffs note that, once questioned about the release, defendants did not require its execution. Thus, it is not clear from the amended complaint

which plaintiffs or how many plaintiffs did in fact sign the general release.

9. The vacancy/rent loss rate reflects the percentage of income lost because of vacant apartments and unpaid rent. Am. Comp. at ¶ 52.

duty. Plaintiffs did not raise either a § 10(b) or RICO claim against defendants in the Illinois suit. Defendants moved to dismiss plaintiffs' complaint on the grounds that the court lacked personal jurisdiction. The Illinois court agreed and dismissed the action.

Plaintiffs filed the present action on April 9, 1992.

## IV. *Discussion*

Defendants assert that plaintiffs' amended complaint should be dismissed under Fed. R.Civ.P. 12(b)(6) as plaintiffs have failed in each count to state a claim upon which relief can be granted. According to defendants, all of plaintiffs' claims are either time-barred or do not state a cause of action. In addition, defendants contend that plaintiffs' fraud claims should be dismissed under Fed. R.Civ.P. 9(b) as plaintiffs have failed to plead fraud with sufficient particularity.

I will discuss each of plaintiffs' five claims.

### A. The 10(b) Claim

A-plaintiffs have alleged that the Sovereign defendants violated § 10(b) and Rule 10b–5 by making material misrepresentations and omissions in the Sovereign PPM in connection with the sale of securities. Am. Comp. at ¶ 66; Plaintiffs' Opp. at 43–44. Sovereign defendants contend that A-plaintiffs' securities claim is time-barred. I agree.

#### 1. *Statute of Limitations*

A-plaintiffs filed their § 10(b) claim in New York district court in February 1990. Upon the dismissal of the claim by the New York court, A-plaintiffs refiled their § 10(b) claim in Pennsylvania district court in April 1992. In the time between these two filings, the law concerning the limitations period for § 10(b) claims underwent a dramatic change.

The Securities Exchange Act does not specify the limitations period for § 10(b) claims, and as of February 1990 the circuits were split as to how this time period should

be determined. At that time, a number of circuits—including the Second Circuit—ascertained the statute of limitations for § 10(b) claims by looking to state statutes of limitations for parallel causes of action. *See Ahmed v. Trupin,* 781 F.Supp. 1017 (S.D.N.Y.1992) (discussing history of Second Circuit law concerning limitations period for § 10(b) claims). For example, the Second Circuit applied the New York statute of limitations for fraud to § 10(b) claims, requiring § 10(b) plaintiffs to bring their claims within two years of discovering the violation and in no case later than six years of the violation. N.Y.Civ.Prac.L. & R. § 213(8). Other courts—including the Third Circuit—considered it inappropriate that the statute of limitations for a § 10(b) claim would vary from state to state and believed there should be a uniform federal statute of limitations. *See In re Data Access Systems Securities Litigation,* 843 F.2d 1537 (3d Cir.), *cert. denied,* 488 U.S. 849, 109 S.Ct. 131, 102 L.Ed.2d 103 (1988); *Short v. Belleville Shoe Manufacturing Co.,* 908 F.2d 1385 (7th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991). Looking to the limitations periods for analogous federal securities law,[10] the Third Circuit concluded that the statute of limitations for a § 10(b) claim was "one year after the plaintiff discovers the facts constituting the violation, and in no event more than three years after such violation." *Data Access,* 843 F.2d at 1550; *accord Belleville Shoe, supra.* In November 1990, some months after A-plaintiffs commenced their action against Sovereign defendants in New York court, the Second Circuit changed its practice and adopted the federal limitations period set out in *Data Access* and *Belleville Shoe. Ceres Partners v. GEL Associates,* 918 F.2d 349, 358–60 (2d Cir.1990).

On June 19, 1991 the Supreme Court ended this split in the circuits and embraced a uniform federal statute of limitations period for private actions brought pursuant to § 10(b). *Lampf, Pleva, Lipkind, Prupis &*

---

**10.** The Third Circuit looked to the statute of limitations for express rights created by the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* After substantial investigation, the court concluded:

[w]hen Congress has created a right to sue in securities matters, it has, with one exception, declared a limitations period of no longer than three years. *See* 15 U.S.C. §§ 77m, 78i(e), 78r(c) and 78cc(b).

*Data Access,* 843 F.2d at 1550.

*Petigrow v. Gilbertson*, —— U.S. ——, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). The Court in *Lampf* required that § 10(b) claims be filed within one year after discovery of the violation and absolutely within three years from date of violation. *Id.* —— U.S. at ——, 111 S.Ct. at 2781–82.

Because A-plaintiffs filed their claim in the midst of this upheaval concerning the limitations period for § 10(b) claims, a question arises as to what statute of limitations applies to their claim. A-plaintiffs argue that the New York statute of limitations for § 10(b) claims as of February 1990 applies, while the Sovereign defendants contend that the uniform federal statute of limitations announced in *Lampf* and/or *Data Access* controls.

On the same day that the Court decided *Lampf,* the Court also decided *James Beam Distilling Co. v. Georgia*, —— U.S. ——, ——, 111 S.Ct. 2439, 2448, 115 L.Ed.2d 481 (1991), concluding that in the civil context "when the Court has applied a rule of law to the litigants in one case it must do so with respect to all others not barred by procedural requirements or res judicata." In light of *James Beam,* it was "evident that the retroactive ruling in *Lampf* [was] to be applied retroactively to all cases not finally adjudicated on the date when *Lampf* was decided." *Welch v. Cadre Capital*, 946 F.2d 185, 187 (2d Cir.1991) ("*Welch II* ").[11]

In an effort to limit the retroactive application of *Lampf,* Congress amended the Securities Exchange Act of 1934 on December 19, 1991 by adding after section 27, 15 U.S.C. § 78aa, a new section 27A, 15 U.S.C. § 78aa–1. Under § 27A, *Lampf* applied only to cases commenced after the day *Lampf* was

decided, June 19, 1991. *See* Securities Exchange Act of 1934, § 27A, 15 U.S.C. § 78aa–1. Section 27A states:

(a) EFFECT ON PENDING CAUSES OF ACTION.—The limitations period for any private civil action implied under 10(b) of this Act that was commenced on or before June 19, 1991, shall be the limitation period provided by the laws applicable in the jurisdiction, including principles of retroactivity, as such existed on June 19, 1991.

(b) EFFECT ON DISMISSED CAUSES OF ACTION.—Any private civil action implied under section 10(b) of the Act that was commenced on or before June 19, 1991—

(1) which was dismissed as time barred subsequent to June 19, 1991, and

(2) which would have been timely filed under the limitation period provided by the laws of applicable in the jurisdiction, including principles of retroactivity, as such laws existed on June 19, 1991, shall be reinstated on motion by the plaintiff not later than 60 days after the date of enactment of this section.

Federal Deposit Insurance Corporation Improvement Act of 1991, Pub.L. No. 102–242, § 476, 105 Stat. 2236. *See generally Maio v. Advanced Filtration Systems, et al.*, 795 F.Supp. 1364 (E.D.Pa.1992).

Fortunately, this case does not require that I assess the retroactive application of *Lampf* to A-plaintiffs' claims. Even assuming A-plaintiffs are covered under § 27A, and assuming further that A-plaintiffs timely filed their § 10(b) claims under the applicable § 10(b) limitations period in the Second Circuit in accordance with § 27A(b),[12] this

---

**11.** In *Welch v. Cadre Capital,* 923 F.2d 989, 993–95 (2d Cir.1991) ("*Welch I* "), the Second Circuit had declined to give retroactive application to the shorter federal statute of limitations for § 10(b) claims the court had recently adopted in *Ceres.* The Supreme Court remanded the case to be reconsidered in light of *James Beam* and *Lampf. Northwest Savings Bank, PaSA, et al. v. Welch,* —— U.S. ——, 111 S.Ct. 2882, 115 L.Ed.2d 1048 (1991). *Welch II* is the Second Circuit's decision on remand.

**12.** I would note that I am not convinced of either of these premises.

Section § 27A(b)(1) protects claims commenced before June 19, 1991 that are subsequently dismissed as time-barred. *See Maio,* 795 F.Supp. at 1376. While plaintiffs' New York action was filed before June 19, 1991 (it was filed February 1, 1990), the action including the § 10(b) claim was dismissed not because the § 10(b) claim was time-barred under *Lampf,* but because of the forum selection clause in the Sovereign Partnership Agreement conferring jurisdiction in the Pennsylvania courts for all disputes arising out of the Agreement. Defendants' Ex. 3 at 3–4. Section 27A(b)(1) would therefore not appear to cover A-plaintiffs.

fact has no bearing ultimately on the timeliness of A-plaintiffs' § 10(b) claim in Pennsylvania district court.

The centerpiece of A-plaintiffs' argument is their belief that under the Pennsylvania saving clause, 42 Pa.Cons.Stat.Ann. § 5535 (1981),[13] they had a grace period of one year in which to refile their action following the dismissal of their New York action without prejudice. According to A-plaintiffs, they had one year from October 4, 1991 to refile their complaint, and they did so—filing the present complaint in April 1992.

■■■ However, a state saving clause can not be used to extend a federal limitation period. *See* 4 C. Wright & A. Miller, *Federal Practice and Procedure* § 1056, 192–193

(1987). Whether one looks to the date A-plaintiffs filed their New York action (February 1990), or the date the case was dismissed (October 1991), or the date the case was refiled in this court (April 1992), the Third Circuit at all these times applied a federal statute of limitations to § 10(b) claims. *See Data Access, supra* (decided in 1988). Accordingly, A-plaintiffs' reliance on § 5535 is unavailing. The only question then is whether A-plaintiffs filed their § 10(b) claim in this court within the federal statute of limitations set out in *Data Access*.[14]

■■■ Under *Data Access*, the statute of limitations for a § 10(b) claim is "one year after the plaintiff discovers the facts constituting the violation, and in no event more

---

Section § 27A(a) applies to pending causes of action. A-plaintiffs' § 10(b) claim was dismissed in October 1991, such that it was pending when *Lampf* was decided. However, the dismissal of the New York action would seem to deprive the claim of its pending status. Even if § 27A(a) were somehow applicable, though, only a portion of the class of A-plaintiffs can be said to have timely filed their § 10(b) claim under the law applicable at the time in the Second Circuit. When A-plaintiffs filed their § 10(b) claim in New York, Second Circuit courts applied different statutes of limitations for resident and nonresident plaintiffs. For resident plaintiffs, courts would apply the statute of limitations for fraud, which was two years from the date of discovery or six years from the fraudulent act. N.Y.Civ. Prac.L. & R. § 213(8). For nonresident plaintiffs, the courts would, under the borrowing statute, look to the statute of limitations for § 10(b) claims in plaintiff's resident state. N.Y.Civ. Prac.L. & R. § 202. "[I]n a § 10(b) action, the cause of action accrues, 'where "its economic impact is felt, normally the plaintiff's residence.'" Thus, if a suit brought in the 'place' of the plaintiff's residence would be time-barred, the suit in a New York federal court is time-barred." *Ceres Partners v. GEL Associates*, 918 F.2d 349, 353 (2d Cir.1990) (citations omitted). Of the the seventeen A-plaintiffs, only four are from New York. Of the other thirteen, four are from Pennsylvania, four from Minnesota, three from Virginia, one from Florida, and one from New Jersey. From the parties' papers, then, it appears that the New York plaintiffs' § 10(b) claim may have been timely filed in New York. However, as will be discussed in the text, the Pennsylvania and New Jersey plaintiffs would have been time-barred from raising their § 10(b) claim under *Data Access*, the law of the Third Circuit at the time A-plaintiffs filed their New York action, since the claim was filed more than three years after the alleged violation. None of the briefs addressed the relevant statute of limita-

tions for § 10(b) claims for the Minnesota, Virginia or Florida plaintiffs.

13. 42 Pa. Cons.Stat.Ann. § 5535 (1981) states the following:

(a) Termination of a prior matter—
(1) If a civil action or proceeding is timely commenced and is terminated, a party, or his successor in interest, may, notwithstanding any other provision of this subchapter, commence a new action or proceeding upon the same cause of action within one year after the termination....

14. Moreover, the filing of the New York action which was ultimately dismissed without prejudice, albeit involuntarily, did not slow the running of the statute of limitations on the claims raised therein. *See Dupree v. Jefferson*, 666 F.2d 606, 611 (D.C.Cir.1981) (explaining that statutes of limitation are not arrested during pendency of prior actions voluntarily or involuntarily dismissed so long as dismissal is without prejudice). As the Pennsylvania Superior Court has noted:

An action in state court does not toll the running of the statute of limitations against subsequent action in federal court. *Falsetti v. Local Union No. 2026, United Mine Workers of America*, 355 F.2d 658 (3d Cir.1966). And, similarly, an action in one state does not toll the running of the statute of limitations against action in another state. *Overfield v. Pennroad Corp.*, 146 F.2d 889 (3d Cir.1944).

*Royal–Globe Ins. Cos. v. Hauck Mfg. Co.*, 233 Pa.Super. 248, 335 A.2d 460, 462 (1975) (Adopting rule of *Willard v. Wood*, 164 U.S. 502, 523, 17 S.Ct. 176, 181, 41 L.Ed. 531 (1896)). *See also Stinson v. Kaiser Gypsum Co., Inc.*, 972 F.2d 59, 62 (3d Cir.1992); *Williams Studio v. Nationwide Mutual Fire Insur. Co.*, 380 Pa.Super. 1, 550 A.2d 1333, 1336 (1988); *Skehan v. Bloomsburg State College*, 94 Pa.Cmwlth. 252, 503 A.2d 1000, 1005 (1986).

than three years after such violation." 843 F.2d at 1550. Using either time frame, A-plaintiffs did not file their claim in a timely manner. According to A-plaintiffs, they discovered the fraud and false statements in the Sovereign PPM giving rise to the § 10(b) claim in July 1989. Plaintiffs' Opp. at 21. Since they did not file their complaint with this court until April 1992, A-plaintiffs manifestly did not file within one year from the point of discovery of the facts of the alleged violation.

Nor did plaintiffs file the action within three years of the events complained of. Defendants suggest that the date the securities were purchased by investors marks the date of the violation. See Defendants' Motion to Dismiss Amended Complaint ("Motion to Dismiss") at 14. Plaintiffs on the other hand suggest that the violation occurred when Sovereign defendants wrote the allegedly false Sovereign PPM. See Plaintiffs' Opp. at 21–22. Using either date, A-plaintiffs' § 10(b) claim is untimely. A-plaintiffs state that the alleged § 10(b) violation "commenc[ed] in approximately 1984." Am. Comp. at 66. Given that the renovations were supposed to be completed by 1985, it makes sense that both the sale of the securities and the writing of the Sovereign PPM occurred at least before 1985. Under *Data Access*, therefore, the latest plaintiffs could have filed their § 10(b) claim in Pennsylvania court would have been some time in 1987. Again, A-plaintiffs did not file the present matter until April 1992.

In sum, A-plaintiffs' § 10(b) and Rule 10b–5 claims were not filed within the statute of limitations. Thus, claim I will be dismissed.

## B. The Fraud Claim

■ Because the allegations of fraud underlie plaintiffs' RICO claim against defendants, it would be useful at this point to consider the validity of plaintiffs' common law fraud claim. Plaintiffs allege that the

defendants' conduct with regard to the Sovereign and Crestwood Partnerships constituted fraud (claim III). Although the substance of the alleged fraud is not explicitly delineated by plaintiffs, it appears from the nature of the allegations against defendants that plaintiffs are raising a claim of fraudulent misrepresentation. To state a claim for fraudulent misrepresentation under Pennsylvania law, plaintiffs must plead (1) misrepresentation, (2) fraudulent utterance thereof, (3) intention by the maker that recipient will be induced to act, (4) reasonable reliance by the recipient on the misrepresentation, and (5) injury to recipient as a proximate result. *See, e.g. Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 731 (3d Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 3034, 120 L.Ed.2d 903 (1992). In stating a claim for fraudulent misrepresentation, as compared to negligent misrepresentation, plaintiffs must demonstrate that the misrepresentation was made knowingly or recklessly by defendants. *See, e.g. Brindle v. West Allegheny Hospital*, 406 Pa.Super. 572, 594 A.2d 766, 768 (1991) (interpreting "fraudulent utterance" element as referring to defendant's scienter) (citing *B.O. v. C.O.*, 404 Pa.Super. 127, 590 A.2d 313 (1991)).

■ Taking a rather cynical view of plaintiffs' allegations, defendants suggest that plaintiffs' claims of fraud are nothing more than fraud by hindsight and should thus be dismissed under Fed.R.Civ.P. 12(b)(6). As defendants view the allegations, plaintiffs realized that defendants' projections regarding the success of the Sovereign and Crestwood projects were incorrect, and therefore concluded that there must have been fraud. Defendants further argue that where projections are accompanied by document language that "bespeaks caution," the projections even if incorrect cannot be the basis of a fraud claim. Motion to Dismiss at 33.[15]

---

**15.** The cases discussing the "bespeaks caution" approach, *see infra* at pp. 23–25, concern the validity of federal securities law claims. Defendants argue that the court should follow the "bespeaks caution" approach in deciding to dismiss all of plaintiffs' claims based in fraud, yet none of the cases discussing the doctrine involves

claims of common law fraud. Nonetheless, I believe the "bespeaks caution" approach is relevant to the common law fraud claims in the present matter. The reasons arguing for application of the "bespeaks caution" doctrine in the securities fraud context pertain in the common law fraud context as well. Specifically, whether

In the alternative, defendants argue that plaintiffs' fraud claims should be dismissed pursuant to Fed.R.Civ.P. 9(b) as insufficiently pled.

Since the allegations of fraud with respect to the Sovereign Partnership and the Crestwood Partnership differ, I will address them separately.

### 1. *Sovereign Partnership*

 As an initial matter, I do not agree with defendants' characterization of plaintiffs' fraud claim against defendants with respect to the Sovereign Partnership. Upon review of the claims stemming from the Sovereign Building partnership, I am not convinced that they are an example of fraud by hindsight. Plaintiffs are not alleging, as defendants suggest, that the Sovereign PPM understated the potential benefits coming plaintiffs' way. Rather, in their main allegation of fraud plaintiffs assert that the Sovereign defendants promised to renovate the buildings for a fixed amount while knowing that the renovation would cost more. Am. Comp. at ¶¶ 37(a), 39(a), (b). While it is true that a promise to do something in the future can not serve as a basis for a fraud claim, the "essence of fraud is in the misrepresentation that occurs when a defendant makes a bargain with no intention of living up to it." *American Trade Partners v. A–1 International Importing*, 755 F.Supp. 1292, 1301 (E.D.Pa.1990). Since plaintiffs have alleged that defendants had no intention of renovating the Sovereign buildings for the fixed price given in the offering memorandum, plaintiffs have a valid fraud claim with respect to the Sovereign Partnership.

 Defendants argue that the presence of cautionary language in the Sovereign PPM specifically warning of the risks of construction precludes plaintiffs' fraud claim. If the facts of this case were only that defendants' estimated construction costs went awry, per-

haps defendants' argument would be persuasive. However, defendants were not estimating a cost, they were promising a fixed price. The "bespeaks caution" doctrine has no application in the context of broken promises.

The case generally considered seminal with respect to the "bespeaks caution" doctrine, and cited by defendants, is *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir.1986). *See In re Donald J. Trump Casino Securities Litigation*, 793 F.Supp. 543, 549 (D.N.J.1992) (noting that the First, Second, Sixth, Eighth and Ninth Circuit Courts have adopted the "bespeaks caution" approach of *Luce*). In *Luce*, plaintiffs alleged two groups of misrepresentations: one concerned the extent of tax and financial benefits the investors would receive and the other concerned promises made by the general partners to the investors. As to the first group of misrepresentations, the *Luce* court concluded:

> the Offering Memorandum warned prospective investors that "[a]ctual results may vary from the predictions and these variations may be material." We are not inclined to impose liability on the basis of statements that clearly "bespeak caution." *Polin v. Conductron Corp.*, 552 F.2d 797, 806 n. 28 (8th Cir.), *cert. denied*, 434 U.S. 857, 98 S.Ct. 178, 54 L.Ed.2d 129 (1977).

*Luce*, 802 F.2d at 56 (citations omitted).

But as to the second group of misrepresentations, the court explained:

> While the failure to carry out a promise made as consideration for a sale of securities may be an element of a Section 10(b) claim, that failure does not constitute fraud if the promise was made with a good faith expectation that it would be carried out. However, ... *[p]lausible allegations that defendants made specific promises to induce a securities transaction while secretly intending not to carry them out knowing they could not be carried out, and that they were not carried out, are sufficient*

---

there was cautionary language in the document would seem relevant to the question of defendants' intent to defraud and plaintiffs' reasonable reliance.

This, of course, is not to say that the standards for establishing securities law and common law fraud claims are the same. As noted by the

Third Circuit in *Data Access*, the securities laws are designed to create "higher standards of conduct in the securities industry" than common law fraud has demanded. *Data Access*, 843 F.2d at 1544 (quoting *Herman & MacLean v. Huddleston*, 459 U.S. 375, 389, 103 S.Ct. 683, 691, 74 L.Ed.2d 548 (1983)).

*... to state a claim for relief under Section 10(b).*

*Luce,* 802 F.2d at 56 (citations omitted) (emphasis added). Thus, despite the presence of cautionary language in the offering memorandum, the *Luce* court let stand plaintiffs' securities fraud claim based on the alleged broken promises.

Plaintiffs have alleged that defendants knowingly misrepresented to plaintiffs that the construction costs for renovating the Sovereign Partnership project would be fixed, that defendants did so to induce plaintiffs to invest, that plaintiffs reasonably relied on defendants' representation of costs, and, finally, that they were injured in their ultimate decision to buy the securities and in the lost value of the investment. Having pled (1) misrepresentation, (2) fraudulent utterance thereof, (3) intention by the maker that recipient will be induced to act, (4) reasonable reliance by the recipient on the misrepresentation, and (5) injury to recipient as a proximate result, plaintiffs have stated a claim for fraud. *See Tunis,* 952 F.2d at 731.[16]

■ Plaintiffs have also claimed fraudulent misrepresentation with respect to the July 1989 letter to investors and the information statement and letter mailed by Butcher on September 18, 1989. Am. Comp. at ¶¶ 38, 40. Plaintiffs contend that within the information statement defendants falsely attributed the Sovereign Partnership's difficult financial situation to a "soft market," while omitting to explain that inflated debt payments were the true cause of the Partnership's weak financial status. *Id.* In addition, plaintiffs allege that defendants falsely stated in the July 1989 letter to investors and in the information statement that the limited partner plaintiffs would need to forfeit much of their interest in the partnership and sign a general release form. Am. Comp. at ¶ 38(b). Plaintiffs further state that defendants made the misrepresentations or omissions, hoping

to induce plaintiffs' investment in the project and their consent to a new general partner, and that plaintiffs reasonably relied on the above misrepresentations and omissions. Again, under *Tunis,* these allegations state a claim for fraud.

■ Alternatively, defendants argue that even if plaintiffs have stated a claim for fraud, the allegations of fraud are inadequately pled under Fed.R.Civ.P. 9(b). In pleading claims of fraud, "the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other conditions of mind of a person may be averred generally." Fed. R.Civ.P. 9(b). The particularity requirement, however, must be read in conjunction with the liberal pleading rule of Fed.R.Civ.P. 8. As the Third Circuit has noted, "focusing exclusively on its 'particularity' language is 'too narrow an approach and fails to take account of the simplicity and flexibility contemplated by the rules.'" *Christidis v. First Pennsylvania Mortg. Trust,* 717 F.2d 96, 100 (3rd Cir.1983) (quoting 5 C. Wright & A. Miller Federal Practice and Procedure § 1298, at 407 (1968)). Fed.R.Civ.P. 9(b) does not require that plaintiffs plead the exact date, place and time of the alleged fraudulent act. *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.,* 742 F.2d 786, 791 (3rd Cir.1984), *cert. denied,* 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985). All that is required is that "plaintiffs plead with particularity the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Id.*

■ Using this standard, I find plaintiffs' allegations of fraud with respect to the Sovereign Partnership to be pled with sufficient particularity. Plaintiffs cite numerous mis-

---

16. Defendants contend that plaintiffs' allegations of fraud are too conclusory in that plaintiffs never offer facts to support the claim that defendants knew that the statements made were false or misleading. Under Fed.R.Civ.P. 9(b), defendants' knowledge of the fraudulent activity may be "averred generally," since questions of state of mind are inherently difficult to support with

facts at the pleading stage. It is not necessary under Fed.R.Civ.P. 9(b) "that a plaintiff plead with such particularity that the cause of action be proven prior even to the summary judgment stage of litigation." *In re Scott Paper Securities Litigation,* 138 F.R.D. 56, 60 (E.D.Pa.1991) (citation omitted).

representations and omissions in the Sovereign PPM, the July 1989 letter to investors, and the September 1989 Information Statement and accompanying letter. Am. Comp. ¶¶ 37–40. Plaintiffs have provided defendants with the specific documents plaintiffs consider to be fraudulent, pinpointed the portions of the documents they believe were misrepresentative, and provided the dates on which most of the documents were distributed. Moreover, as described above, plaintiffs have stated defendants' purpose in making these misrepresentations and omissions.

Accordingly, defendants' motion to dismiss plaintiffs' fraud claim with respect to the Sovereign Partnership under Fed.R.Civ.P. 9(b) will be denied.[17]

### 2. *The Crestwood Partnership*

In support of their claim of fraud with respect to the Crestwood Partnership, plaintiffs have alleged that the assumption underlying the Crestwood PPM financial projection—"that the property would maintain a vacancy/rent loss rate of 5% and that rents would increase 2% over the current rents at the time of offering and increase 7% per year thereafter"—was not reasonable under the circumstances. Am. Comp. at ¶¶ 51, 53. According to plaintiffs, defendants (1) misrepresented the reasonableness of the financial projections, using arbitrary underlying assumptions not related to the project area, Am. Comp. at ¶ 54(a), (c), ¶ 55(b), (c) [18]; (2) omitted to note that the vacancy/rent loss rate was 6.6% to 10.8% in the Phoenix metropolitan area (including Mesa), Am. Comp. at ¶ 55(a); and (3) misrepresented to plaintiffs that the financial projections had been reviewed by accountants, when the accountants had been paid a large fee not to do the investigation, Am. Comp. at ¶ 54(b).

■ "The fact that a projection or estimate turned out to be incorrect, standing alone, does not even raise an inference that the statement was fraudulent when made." *Urbach v. Sayles,* 779 F.Supp. 351, 358 (D.N.J.1991). However, under Pennsylvania law, a projection that is made without a reasonable basis is an untrue statement and is fraudulent if made knowingly or recklessly. *See B.O. v. C.O.,* 404 Pa.Super. 127, 590 A.2d 313 (1991); *In re Craftmatic Securities Litigation,* 890 F.2d 628, 645–46 (3d Cir.1989). To support an inference of fraud, plaintiffs must produce evidence tending to establish that defendants lacked a reasonable basis for their estimate. *Donald J. Trump Casino Securities Litigation,* 793 F.Supp. at 557 (D.N.J.1992) (citing *Sinay v. Lamson & Sessions Co.,* 948 F.2d 1037 (6th Cir.1991); *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.), *cert. denied,* 498 U.S. 941, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990)). Plaintiffs must submit objective evidence on the basis of which this court could conclude that there was no reasonable basis for defendants' assumption as to the vacancy/rent loss rate.

■ Plaintiffs have adequately alleged such facts. As stated above, plaintiffs allege that the vacancy/rent loss rate for the Phoenix metropolitan area (including Mesa) was 6.6% to 10.8% in 1984. Although plaintiffs provide no citation for this statistic, and make no effort to provide the vacancy/rent loss rate for the Crestwood project area or Mesa alone, the court is bound in a motion to dismiss to make all reasonable inferences in favor of the nonmovant. Based on the discrepancy between the vacancy/rent loss rate used by defendants in the PPM and the vacancy/rent loss rates cited by plaintiffs, a reasonable juror could infer that the 5% rate assumed by defendants in their financial projections was not reasonable. *See Sinay,* 948 F.2d at 1040; *Donald J. Trump Casino Securities Litigation,* 793 F.Supp. at 557.[19]

---

**17.** *See infra* Part D for a discussion of the timeliness of plaintiffs' fraud claims.

**18.** Whereas ¶ 55(b) and (c) claim omissions by defendants, they are nothing but the inverse of the misrepresentations in ¶ 54(a) and (c)—i.e., defendants failed to disclose that the assumptions underlying the financial projections were arbitrary and unreasonable.

**19.** Plaintiffs' allegation that defendants hired an accounting firm in order to deceive the investors into believing that the financial projections were reasonable might also be interpreted as supporting plaintiffs' suggestion that the 5% vacancy/rent loss rate has no reasonable basis. However, as the allegation is at this stage nothing but a conclusory accusation, it is not the sort of objective evidence upon which a trier of fact

■ Defendants have argued that the cautionary language in the Crestwood PPM warning of the unreliability of the financial forecast and its underlying assumptions precludes an action for fraud based on the financial projections. Upon review of the cases discussing the "bespeaks caution" approach, it would appear that the doctrine does not apply unless the projection at issue reflects an honestly held belief of the declarant. As the Sixth Circuit described the course of a court's analysis:

> In determining whether the statements are actionable, the court must scrutinize the nature of the statement to determine whether the statement was false when made. While analyzing the nature of the statement, the court must emphasize whether the "prediction suggested reliability, bespoke caution, was made in good faith, *or* had a sound factual or historical basis."

*Sinay,* 948 F.2d at 1040 (quoting *Isquith v. Middle South Utils., Inc.,* 847 F.2d 186, 204 (5th Cir.), *cert. denied,* 488 U.S. 926, 109 S.Ct. 310, 102 L.Ed.2d 329 (1988)) (emphasis added). Whereas the 5% vacancy/rent loss rate assumption used by defendants may well be surrounded by language "bespeaking caution," the objective evidence presented by plaintiffs concerning vacancy rates in the Phoenix metropolitan area could reasonably support an inference that defendants did not choose the vacancy/rent loss rate in "good faith" or "with sound factual or historical basis."[20] At this stage, then, the "bespeaks caution" doctrine does not necessarily prevent plaintiffs' fraud claim.

In alleging that defendants knowingly issued a projection without a reasonable basis

and by supporting that allegation with recitals of assertedly provable objective facts, plaintiffs have stated a claim for fraud with respect to the Crestwood Partnership. *See B.O. v. C.O.,* 404 Pa.Super. 127, 590 A.2d 313 (1991); *In re Craftmatic Securities Litigation,* 890 F.2d 628, 645–46 (3d Cir.1989).

■ Again, defendants alternatively argue that plaintiffs' allegation of fraud is insufficiently pled under Fed.R.Civ.P. 9(b). However, with respect to the alleged fraudulent projection, plaintiffs have provided the document, the date of its issuance, the fraudulent statement and the purpose of the fraud. Thus, defendants have more than adequate notice of their alleged misconduct.

■ Plaintiffs have made other allegations of fraud surrounding the Crestwood Partnership that do not withstand scrutiny under Fed.R.Civ.P. 9(b). As noted above, plaintiffs allege in their complaint that the accounting professionals of McGlarrey, Henderson & Pollen, whom defendants note were hired to review the financial projections, agreed for a large sum to approve the financial projections without investigation. Am. Comp. at ¶ 54(b). A conclusory allegation such as this will not satisfy the pleading requirements of Fed.R.Civ.P. 9(b). C. Wright A. Miller, *Federal Practice and Procedure* § 1297, at 612 (1990).[21]

■ In addition, plaintiffs allege that defendants "withheld relevant information from the Crestwood Apt. plaintiffs over the life of the investment including information concerning the true causes of the partnership problems," Am. Comp. at ¶ 57, and that "the status reports that plaintiffs did receive

could base an inference of fraud. *Donald J. Trump Casino Securities Litigation,* 793 F.Supp. at 557.

20. Under defendants' apparent interpretation of the "bespeaks caution" approach, one could construct a completely inaccurate and fraudulent offering memorandum, yet be shielded from a fraud claim as long as there was language in the document cautioning investors of the specific risks. To the extent that such a rule would allow, if not encourage, fraud and non-disclosure on the part of corporate actors, it clearly is not a viable application of the "bespeaks caution" doctrine.

21. Fraud may be pled conclusorily based on information and belief when the information is peculiarly within the opposing party's possession and when plaintiffs can plead facts to support the allegation. However, plaintiffs have not satisfied the pleading requirements for allegations based on information and belief either. *See In re Craftmatic Securities Litigation,* 890 F.2d 628 (3d Cir. 1989). Plaintiffs did not state that they were claiming fraud based on information or belief nor have plaintiffs offered facts to support the supposed bribery of the accountants.

failed to paint a true picture of the actual status of the property and falsely attributed any deficiencies to other factors such as the original property manager and an increase in the availability of apartments in Mesa," Am. Comp. at ¶ 58–60. Both of these allegations are fatally vague and overbroad. The "life of the investment" spanned approximately six years, during which time a number of status reports may have been issued. Plaintiffs do not specify in what context defendants withheld information, what information regarding the "true causes of the partnership problems" was withheld apart from the supposedly inaccurate financial projection, which of the status reports contained misrepresentations and what parts of the status reports were false.

Accordingly, aside from plaintiffs' allegation of fraud with regard to the vacancy/rent loss rate, plaintiffs' allegations of fraud as to the Crestwood Partnership will be dismissed under Fed.R.Civ.P. 9(b).[22]

## C. The RICO claim

In count II of their amended complaint, plaintiffs have raised a civil RICO action, alleging that defendants: derived income directly or indirectly through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(a), Am. Comp. at ¶ 77; participated or agreed to participate in the conduct of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c), Am. Comp. at ¶ 78; and conspired to violate § 1962(a) and § 1962(c), in violation of 18 U.S.C. § 1962(d). Defendants raise a number of arguments to defeat plaintiffs' RICO claim: (1) the RICO claim is time-barred; (2) the underlying fraud claims are inadequately pled under Fed.R.Civ.P. 9(b); (3) plaintiff has failed to state a RICO claim; and (4) plaintiffs lack standing to bring a RICO claim since they have not suffered an injury to property or business. I will address each argument in turn.

**22.** *See infra* Part D for a discussion of the timeliness of plaintiffs' fraud claims.

**23.** The fact that plaintiffs' securities claim is barred under the statute of limitations has no bearing on the legitimacy of their RICO claim. "[A] civil RICO cause of action is not to be

### 1. *The statute of limitations*

A RICO cause of action accrues when "the plaintiff knew or should have known of the last injury or the last predicate act which is part of the same pattern of racketeering." *Keystone Ins. Co. v. Houghton*, 863 F.2d 1125, 1126 (3d Cir.1988). Once the claim has accrued, the statute of limitations for a RICO cause of action is four years. *Agency Holding Corp. v. Malley–Duff & Associates, Inc.*, 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987).

From the face of the amended complaint, the last predicate act occurred in September 1989 when Butcher mailed the information statement to the investors and suggested that a release needed to be signed. Plaintiffs filed their RICO claim well within four years of September 1989.

### 2. *Fed.R.Civ.P. 9(b)*

Defendants next challenge plaintiffs' RICO claim under Fed.R.Civ.P. 9(b). The offenses which, according to plaintiffs, constitute a pattern of racketeering include federal securities,[23] mail, and wire fraud—all of which must be pled with particularity in compliance with Fed.R.Civ.P. 9(b). *See Alfaro v. E.F. Hutton & Co., Inc.*, 606 F.Supp. 1100, 1118 (E.D.Pa.1985).

The allegations of securities fraud on which the RICO claim is partially based is derived from plaintiffs' common law fraud pleadings with regard to the Sovereign PPM. For the same reason this court found the common law fraud pleading sufficient with regard to the Sovereign offering memorandum, the court believes the allegation of securities fraud is sufficiently pled under Fed. R.Civ.P. 9(b).

Because a RICO claim requires a "pattern of racketeering" activity, plaintiffs must properly plead at least two acts of racketeering for the RICO claim to stand

identified with its underlying predicate acts in determining statute of limitations issues." *Hoxworth v. Blinder, Robinson & Co., et al.*, 980 F.2d 912, 25 (3d Cir.1992) (quoting *Keystone Ins. Co. v. Houghton*, 863 F.2d 1125, 1130 (3d Cir.1988)).

under Fed.R.Civ.P. 9(b). *Alfaro,* 606 F.Supp. at 1118–1119. Along with securities fraud, plaintiffs have alleged mail and wire fraud. The amended complaint reads:

71. In addition to the racketeering activity under § 1961(1)(D) with regard to the fraudulent sale of securities, defendants engaged in racketeering activity under § 1961(1)(B) through the commission of acts of mail fraud in violation of 18 U.S.C. § 1341 and acts of wire fraud in violation of 18 U.S.C. § 1343 as follows:

(1) the offering Memoranda and accompanying offering materials;

(2) the Subscription Agreements by which investors made their investments in the Partnerships;

(3) the Promissory Notes executed by investors and the defendants in connection with the investments;

(4) the annual "reminder" notices sent by the defendants to the investors regarding payment of the Promissory Notes;

(5) the annual payments made by investors to the defendants and the return of the Promissory Notes by the defendants;

(6) the annual Report on Examination of Financial Statements and Additional Information prepared by the accounting defendant;

(b) Upon information and belief, defendants used and caused to be used interstate wire communications in furtherance of their scheme to defraud, in violation of 18 U.S.C. § 1343, by communicating among themselves and with third parties on numerous occasions throughout the course of the fraudulent scheme and continuing to the present day.

72. The statements made upon information and belief in the preceding paragraph are based on the following facts:

(a) that the defendants syndicated, along with these two partnerships, at least 13 other limited partnerships involving hundreds of investors, including among others;

(1) Sovereign Group 1986–1, d/b/a Coral Gables Biltmore;

(2) Sovereign Group 1986–24, d/b/a Denver Brewery Associates;

(3) Gateway Radio Partners Limited Partnership.

(b) that the properties involved were located in many different states, such as the Crestwood Apartments in Arizona, the Sovereign Building in Pennsylvania, and the Gateway Radio Partners Partnership involving a radio station in Illinois;

(c) that the hundreds of investors in the partnerships sponsored by the defendants reside in numerous different states throughout the country, such as those listed as plaintiffs in this action on Exhibits A and B;

(d) that the scope of the defendants' activities in promoting the "investments," as reflected above could only have been carried out through extensive use of the mails and interstate wire communications. The facts regarding the specific occasions on which the defendants used the mails and wire communications are uniquely within the knowledge of the defendants;

(e) that the defendants repeatedly advised investors to call their Manager of Investor Services, using a New York or "800" telephone exchange, if they had any questions.

■■■ With some hesitation, I find that plaintiffs' mail fraud claim is sufficiently pled. In paragraph 71(a)(1), plaintiffs contend that defendants used the mails to distribute offering memoranda and the accompanying documents. While this reference may be vague standing alone, defendants can discern the particularities of the alleged mail fraud from the remainder of plaintiffs' amended complaint. Specifically, defendants can determine that plaintiffs are referring to the use of the mails to distribute the Sovereign PPM and the Crestwood PPM. From this, defendants are aware of the documents in which the alleged fraud occurred, the content of the alleged fraud and the dates of the documents' issuance.

■■■ I would note that I do not find plaintiffs' allegations of mail fraud sufficiently pled with respect to the other documents cited. Plaintiffs have provided no details

about these documents, such as the dates of their issuance, the persons mailing the documents, the persons receiving the documents, the content of the documents, or the properties to which the documents pertain.

■ Since plaintiffs have pled two of the alleged racketeering acts with specificity, this court finds the RICO claim to be sufficiently pled under Fed.R.Civ.P. 9(b).[24]

### 3. *Failure to State a Claim*

Defendants argue that plaintiffs' RICO claim must be dismissed for failure to state a claim under Fed.R.Civ.P. 12(b)(6). Defendants raise five grounds for dismissal:

1. Plaintiffs fail to plead the requisite racketeering acts;

2. Plaintiffs fail to allege that they were injured by reason of defendants' alleged investment or use of the proceeds of racketeering activity;

3. Plaintiffs have not properly identified any enterprise whose affairs defendants allegedly conducted through a pattern of racketeering activity;

4. Plaintiffs fail to plead the existence of a "pattern" of racketeering activity; and

5. Plaintiffs fail to plead the elements of the RICO conspiracy they allege.

I will address each of defendants' arguments.

### a. failure to plead predicate acts

■ In plaintiffs' amended complaint, they allege numerous predicate acts of securities and mail fraud. To state a 10b–5 claim, plaintiffs must allege that:

1) a security was sold or purchased accompanied by a misrepresentation or omission of material fact;

2) defendant[s] acted with scienter;

3) the plaintiff justifiably relied on such a misrepresentation in connection with the purchase or sale of a security; and

4) the plaintiff suffered damage as a result of the misrepresentation or omission.

*Sowell v. Butcher & Singer, Inc.*, 926 F.2d 289, 296 (3d Cir.1991). Upon review of the amended complaint, I find that plaintiffs have stated a claim of federal securities fraud. Plaintiffs have alleged that defendants misrepresented the amount of the construction costs in the Sovereign PPM with the intent to deceive plaintiffs into investing in the project, that plaintiffs reasonably relied on the misrepresentations, and that plaintiffs were damaged as a result of their investment. Am. Comp. at ¶¶ 37–42, 68.

■ Similarly, I find that plaintiffs have stated a claim for mail fraud. Plaintiffs have alleged (1) the existence of a scheme to defraud, (2) defendants' participation in the scheme with the intent to defraud the investors, and (3) use of the mails of the United States to further the scheme. *United States v. Burks*, 867 F.2d 795, 797 (3d Cir.1989).

### b. Plaintiffs' injury by reason of defendants' alleged investment or use of the proceeds of racketeering activity

■ Under § 1962(a), it is unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income, in the acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a) (1988). To have standing under § 1962, the plaintiff must have suffered an injury as a result of the conduct that constitutes the RICO violation. *Sedi-*

---

**24.** The allegation of wire fraud is inadequate. Plaintiffs' allegation of wire fraud is nothing more than plaintiffs' inference that such wire fraud must have occurred since plaintiffs have demonstrated a fraud scheme and the parties are scattered across the country. While that argument may have some merit, it does not help defendants construct a defense to a claim of wire fraud. Plaintiffs state that defendants control the information regarding the specific occasions of both wire and mail fraud. Am. Comp. at ¶ 72(d). Plaintiffs should at least try to provide as much detail with regard to the instances of wire fraud as they have provided with regard to the instances of mail fraud. For example, plaintiffs could presumably provide details such as the date and content of wire communications involving individual plaintiffs. Plaintiffs may seek leave to amend their wire fraud claim.

*ma, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496–97, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). In the case of a claim arising under § 1962(a),

> [the RICO violation] occurs not when the defendant engages in predicate acts, *but only when he uses or invests the proceeds of that activity in an enterprise.* Consequently, to recover under § 1962(a), the plaintiff must demonstrate that his injuries were proximately caused by that violation.

*Brittingham v. Mobil Corp.*, 943 F.2d 297, 304 (3d Cir.1991) (emphasis added). In other words, the § 1962(a) plaintiff must allege a use or investment injury. As the Third Circuit noted, "requiring the allegation of use or investment injury 'is consistent with both the literal language and fair import of the language [of § 1962(a) ].' " *Rose v. Bartle*, 871 F.2d 331, 358 (3d Cir.1989) (citations omitted).

 Whereas plaintiffs properly state a § 1962(a) violation—asserting that defendants used and invested money derived from a pattern of racketeering activity in various enterprises, Am. Comp. ¶ 77—plaintiffs fail to describe any injury suffered by them as a result of that violation. In ¶ 80, plaintiffs describe their injury as follows:

> By reason of the violations of 18 U.S.C. § 1962(a), (c) and (d), plaintiff and the class have been financially injured in their business and property by the amount of their funds "invested", plus lost use of the money invested, and consequential damages. Their investments in the partnerships had little, if any economic value at the time they were made, and are now worthless.

This is not the type of injury contemplated under § 1962(a). Section 1962(a) provides a cause of action for those injuries precipitated by *defendant's* use and reinvestment of proceeds in various enterprises. Plaintiffs have

described an injury in terms of their own use of and investment.

In their legal memoranda, plaintiffs contend that their statement of injury may also be found in ¶ 77 of their Amended Complaint, which states:

> The defendants are or were principals (within the meaning of 18 U.S.C. § 2) in one or more of the above-described enterprises and have derived income, directly or indirectly, from a pattern of racketeering activity, part of which they have invested in the various enterprises, to continue promoting, organizing and operating the Partnerships.
>
> Such conduct constitutes a violation of 18 U.S.C. § 1962(a).

While this allegation may state a claim under § 1962(a), it again does not allege an injury to plaintiffs as a result of the alleged § 1962(a) violation.[25]

Since plaintiffs have not demonstrated an injury caused by defendants' use or investment of money defrauded from plaintiffs, plaintiffs have not established standing to bring a § 1962(a) claim. Accordingly, plaintiffs' § 1962(a) claim will be dismissed.

### c. Existence of an enterprise

Under § 1962(c)

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ...

18 U.S.C. § 1962(c) (1988). Defendants argue that plaintiffs "have not properly identified any enterprise whose affairs defendants allegedly conducted through a pattern of racketeering activity." Motion to Dismiss at 48.[26]

The court thus affirmed the district court's dismissal of the claim. *Id.* at 1167–68, 1170.

---

**25.** Plaintiffs seem to have confused the two concepts of stating a claim and stating an injury. This is evident from their citation to *Shearin v. E.F. Hutton Group, Inc.*, 885 F.2d 1162 (3d Cir. 1989) as support for their proposition that their § 1962(a) claim should not be dismissed. In *Shearin*, the court found plaintiff's allegations sufficient to support a § 1962(a) claim, but did not believe she had stated a § 1962(a) injury.

**26.** Defendants have not challenged plaintiffs' standing to bring their § 1962(c) claim. Nor does there appear to be a doubt that standing exists. Under *Sedima*, "where a plaintiff alleges each element of the [1962(c) ] violation, the compensable injury necessarily is the harm caused by

Under 18 U.S.C. § 1961(4), the term "enterprise" "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." Plaintiffs allege the existence of two enterprises. First, plaintiffs plead an association-in-fact, alleging that "the group of individuals and entities employed by or associated in fact in the business of organizing, promoting, and selling of investments in the partnership and the subsequent management of the operation of the partnerships" is an enterprise under § 1962(c). Am. Comp. at ¶ 74. In ¶ 75 plaintiffs state that the "defendants are an 'enterprise.'" Because plaintiffs do not use the words "associated in fact" to describe the second enterprise, this court will assume that plaintiffs intend to plead the second enterprise as a legal entity.[27]

In *B.F. Hirsch v. Enright Refining Co., Inc.*, 751 F.2d 628, 633–34 (3d Cir.1984), the Third Circuit stated that under § 1962(c), the "enterprise" and the "person" charged with the RICO violation must be distinct entities. The court found that because the "enterprise" and the "person" were the same in *B.F. Hirsch* —Enright Refining Company, Inc.—a § 1962(c) claim was untenable. Working from the language of § 1962(c), the court stated:

> The Enright Refining Company, Inc. clearly is not employed by the Enright Refining Company, Inc.; nor is it logical to say that the Enright Refining Company, Inc. is associated with the Enright Refining Company, Inc. Thus, the language contemplates that the "person" must be associated with a separate "enterprise" before there can

be RICO liability on the part of the "person."

*Enright,* 751 F.2d at 633.

Plaintiffs' second enterprise cannot stand up under the *Enright* rule requiring separation of the "person" and "enterprise." In treating the group of defendants as a single legal entity, plaintiffs have pled an enterprise indistinguishable from that pled in *Enright.* See *Glessner v. Kenny,* 952 F.2d 702, 710 (3d Cir.1991). Like the Enright Refining Company, Inc., the present defendants when viewed as a single entity are both the "person(s)" perpetrating the RICO violation and the "enterprise." Accordingly, the § 1962(c) claim against the enterprise of the defendants is improper.

The other enterprise alleged by plaintiffs is the association-in-fact of all those involved in the supposedly unlawful real estate scheme, including, this court assumes, defendants and others. This theory of the enterprise presents a slightly more complicated situation.

To the extent that this other enterprise is comprised of defendants, one might expect it poses an *Enright* problem similar to the second enterprise. However, it appears that where the enterprise of defendants is pled as an association-in-fact, as opposed to as a single legal entity, several courts have permitted the § 1962(c) claim to stand. For example, in *Shearin v. E.F. Hutton Group, Inc.*, 885 F.2d 1162, 1165–66 (3d Cir.1989), the Third Circuit found that the association-in-fact of three defendant corporations stated a valid § 1962(c) enterprise. *See also Yellow Bus Lines, Inc. v. Local Union 639*, 839 F.2d 782, 791 (D.C.Cir.1988) (citing *Cullen v. Margiotta*, 811 F.2d 698, 729–30 (2d Cir.), *cert. denied sub nom. Nassau County Republican Committee v. Cullen*, 483 U.S. 1021, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987)).[28]

the predicate acts sufficiently related to constitute a pattern ..." *Sedima,* 473 U.S. at 497, 105 S.Ct. at 3285. As noted above, plaintiffs have claimed an injury stemming from the predicate acts.

**27.** The plain language of § 1961(4) suggests that there are two types of enterprises: either the enterprise is a legal entity—"any individual, partnership, corporation, association or *other legal entity* "—or the enterprise is an association-in-fact that does not constitute a legal entity.

**28.** The Seventh Circuit has suggested that the distinctiveness requirement does not necessarily pertain to association-in-fact enterprises. *See Haroco v. American National Bank and Trust Co. of Chicago,* 747 F.2d 384, 401 (7th Cir.1984), *cert. denied,* 469 U.S. 1157, 105 S.Ct. 902, 83 L.Ed.2d 917, *aff'd,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). Section 1961(3) defines a "person" as "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). Based on this definition, the Seventh Circuit concluded that an association-in-fact was not a "person" under the stat-

■ This is not to say that a plaintiff may circumvent *Enright* simply by pleading an association-in-fact where the enterprise is in actuality a legal entity. The Third Circuit addressed this potential escape route in *Brittingham*. In *Brittingham*, plaintiffs brought a § 1962(c) claim against Mobil Corporation and Mobil Chemical Company for the production and marketing of supposedly degradable garbage bags that did not in fact degrade. Mobil Chemical Company was an unincorporated division of Mobil Oil Corporation, which was a wholly owned subsidiary of Mobil Corporation. Plaintiffs defined the enterprise as Mobil Corporation, Mobil Chemical and the advertising agencies who helped in the marketing of the garbage bags.

Citing *Enright*, the Third Circuit found that the "enterprise" and "person(s)" in *Brittingham* were not distinct. The court explained:

> a § 1962(c) enterprise must be more than an association of individuals or entities conducting the normal affairs of a defendant corporation. A corporation must always act through its employees and agents, and any corporate act will be accomplished through an "association" of these individuals or entities.... Therefore, we must examine the enterprise allegation to determine whether it is no more than an association of individuals or entities acting on behalf of a defendant corporation.

*Brittingham*, 943 F.2d at 301. The court observed that when a defendant is a collective entity, as opposed to an individual, "it is more likely that the alleged enterprise is in reality no different from the association of individuals or entities that constitute the defendant or carry out its actions." *Id.* 943 F.2d at 302. The court concluded that the case had an *Enright* problem since plaintiffs did not allege or present evidence that the defendant corporations, "in contrast to individuals or entities acting on their behalf, took a distinct role in the alleged racketeering activity." *Id.* 943 F.2d at 303. The fact that plaintiffs included the advertising firms in

the alleged enterprise did not affect the court's determination since the firms were but agents of the defendant corporation. *Id.* 943 F.2d at 303.

■ Defendants here contend that plaintiffs' theory of the enterprise as an association-in-fact must be rejected under *Enright* and *Brittingham*. According to defendants, plaintiffs have failed to plead an association-in-fact that is distinct from the defendant corporations, their agents and affiliates.

It is a tricky business to distinguish being associated-in-fact in a common enterprise from being "affiliated." As would necessarily be the case in an association-in-fact enterprise, defendant members of the enterprise are related to one another and are working together in pursuit of a "common purpose." *U.S. v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981). Addressing a similar situation, the District of Columbia Court of Appeals offered a useful articulation of the distinctiveness requirement that may be applied to associations-in-fact. *See Yellow Bus Lines, Inc.*, 839 F.2d at 791. According to the District of Columbia Court of Appeals, an association-in-fact enterprise consisting of defendants is impermissible under § 1962(c) where the "relationship among the members of the enterprise association is the relationship of parts to the whole." *Id.*

From plaintiffs' description of the defendants, it appears that the corporate defendants (Butcher, Sovereign Group, B & S and Sovereign Realty Management) are perhaps but members of a whole. Butcher is the parent company of both B & S and Sovereign Group. Sovereign Realty Management is an unincorporated subsidiary of Butcher, as well as a subsidiary of Sovereign Group. Were these four the only defendants, plaintiffs would face a *Brittingham* situation.

However, in addition to the corporate defendants, plaintiffs have alleged that three partnerships (303–A, 304–A, and 603–A) and two individuals (Lyle Hall and John Seal, Jr.) are part of the association-in-fact. The cor-

---

ute since an association-in-fact did not seem able to "hold any interest in property or even be brought into court." *Haroco*, 747 F.2d at 401. Consequently, the argument goes, § 1962(c), in

contemplating that persons be distinct from the enterprise, necessarily intended that associations-in-fact be distinct from the enterprise as well.

porate defendants were clearly connected to 303–A, 304–A, and 603–A: 303–A was the general partner to the Sovereign Partnership, 304–A was the general partner to the Crestwood Partnership, and 603–A was the contractor for the Sovereign Partnership project. In addition, Sovereign Partners, a subsidiary of the Sovereign Group, held a 50% interest in the three partnerships, and the corporations were involved in the development and promotion of the partnerships. However, neither the connection of the partnerships to the corporated defendants nor 50% ownership persuades the court that the partnerships were necessarily agents of the corporate defendants.

Moreover, while Hall and Seal were the general partners for each of the three partnerships, there is no indication that they were officers of the corporate defendants. In fact, Hall and Seal opposed the corporate defendants for a time and were ultimately displaced as general partners in 1988. Am. Comp. at ¶ 32, 61. The Third Circuit noted in *Brittingham*, "distinctiveness concerns are generally not present when an individual defendant is part of the association-in-fact that constitutes the enterprise." *Brittingham*, 943 F.2d at 302.

Accordingly, I conclude that the association-in-fact pled by plaintiffs is an adequately pled enterprise under § 1962(c).

### d. Existence of a "pattern"

In order to state a civil RICO claim under § 1962(c), plaintiffs must plead a "pattern of racketeering activity." Defendants contend that plaintiffs have not done so.

The RICO statute does not define the term "pattern." Recently, though, in *H.J. Inc. v. Northwestern Tel. Co.*, 492 U.S. 229, 237, 109 S.Ct. 2893, 2899, 106 L.Ed.2d 195 (1989) (emphasis in original), the Supreme Court concluded that a pattern of racketeering activity exists where the alleged predicate acts are "related *and* pose a threat of continued criminal activity." Using this standard, I find that plaintiffs have alleged a pattern of racketeering activity.

Predicate acts are related if they share "the same or similar purposes, results, participants, victims or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240, 109 S.Ct. at 2901. In my view, plaintiffs have satisfied the relatedness requirement, contending that the same defendant participants engaged in a common "scheme to defraud investors through the offering of units in real estate limited partnerships." Am. Comp. at ¶ 13. *See also* Am. Comp. at ¶ 16. Defendants have not challenged the relatedness of the predicate acts.

Plaintiffs have also established continuity. As described by the Court in *H.J. Inc.*, "continuity is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." 492 U.S. at 241, 109 S.Ct. at 2901. Interpreting this portion of *H.J. Inc.*, the Third Circuit wrote:

> "Continuity is a temporal concept ... If a plaintiff alleges a RICO violation over a closed period of time ..., she must prove a series of related predicates lasting over a 'substantial period of time.' If, however, she alleges a RICO violation before continuity is established ('open ended' scheme), she must prove a 'threat of continuity.' A threat of continuity exists when the predicate acts are a part of the defendant's 'regular way of doing business.' "

*Hughes v. Consol–Pennsylvania Coal Co.*, 945 F.2d 594, 609–610 (3d Cir.1991) (citations omitted), *cert. denied*, —— U.S. ——, 112 S.Ct. 2300, 119 L.Ed.2d 224 (1992). In this case, plaintiffs have alleged that the partnerships at issue were sold over a five-year period from 1981 until 1986, Am. Comp. at ¶ 13, and that the initial fraud continued over a ten-year period. Am. Comp. at ¶ 73. In *H.J. Inc.*, the Supreme Court concluded that predicate acts lasting over a six-year period could demonstrate at trial either that the acts persisted for a "substantial period of time" in a closed scheme or that the acts reflected defendant's regular way of doing business in an open-ended scheme. 492 U.S. at 242, 109 S.Ct. at 2902. Similarly, I find that plaintiffs' claim that defendants participated in racketeering activity over the course of five years, engaging in several acts of

securities and mail fraud, establishes continuity.

### e. failure to plead conspiracy

■ Defendants contend that plaintiffs have failed to state a claim under § 1962(d) in that plaintiffs have not pled a conspiracy. Under § 1962(d),

> It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b) or (c) of this section.

18 U.S.C. § 1962(d) (1988). In order to plead conspiracy,

> a plaintiff must set forth allegations that address the period of the conspiracy, the object of the conspiracy, and the certain actions of the alleged conspirators taken to achieve that purpose. Additional elements include agreement to commit predicate acts and knowledge that the acts were part of a pattern of racketeering activity.

*Shearin,* 885 F.2d at 1166 (citations omitted).

Under *Shearin,* plaintiffs have properly pled conspiracy. As noted in the above section, plaintiffs have alleged the period of the conspiracy, as running from 1981 until 1986 and continuing until plaintiffs filed their complaint. In addition, plaintiffs have stated the object of the conspiracy—"to defraud investors through the offering of units in real estate limited partnership projects." Am. Comp. at ¶ 13. Moreover, throughout the amended complaint, plaintiffs describe the conduct of the defendants as a group and the roles of each of the defendants in furtherance of the conspiracy. *See Rose,* 871 F.2d at 366 (citing *Alfaro,* 606 F.Supp. at 1117–18).

■ Finally, this is a case in which defendants' agreement to commit predicate acts and knowledge thereof may be inferred from the nature of the association. According to plaintiffs, "defendants created an investment scheme which virtually guaranteed the failure of the investment while at the same time assured the defendants huge sums of money through enormous fees." Am. Comp. at ¶ 19. Where it is alleged that the association of defendants was created solely for the purpose of perpetrating fraud—as is the case in the present matter—there may be an infer-

ence of agreement and knowledge among the defendants. *Glessner,* 952 F.2d at 714.

Thus, I conclude that plaintiffs have properly pled a conspiracy among defendants. Defendants' motion to dismiss the § 1962(d) claim will therefore be denied.

### 4. *Failure to allege an injury*

■ Finally, defendants contend that plaintiffs lack standing to bring a RICO claim because plaintiffs have not alleged an injury caused by the predicate acts. Under § 1964(c), only persons injured in "business or property by reason of a violation of section 1962" are entitled to civil RICO remedies. 18 U.S.C. § 1962 (1988).

Plaintiffs have alleged that they have been "financially injured in their business or property by the amount of their funds 'invested,' plus lost use of the money invested, and consequential damages. Their investments in the partnerships had little, if any, economic value at the time they were made, and now are worthless." Am.Comp. at ¶ 80. Read in the context of the entire amended complaint, plaintiffs claim they were injured in their payment of a fraudulently inflated rate for their securities. This states an injury to "business or property" within the meaning of RICO. *See e.g., Goodridge v. Harvey Group, Inc.,* 778 F.Supp. 115 (S.D.N.Y.1991); *Wilkinson v. Paine, Webber, Jackson & Curtis, Inc.,* 585 F.Supp. 23 (D.C.Ga.1983).

### D. The State Law Claims

■ Pendent to their federal claims, plaintiffs have raised three state law claims sounding in negligence (claim V), breach of fiduciary duty (claim VI), and, as discussed above, fraud (claim III). Defendants argue that each of the claims is time-barred and should thus be dismissed.

Again, plaintiffs have argued that Pennsylvania's savings clause, 42 Pa. Cons.Stat.Ann. § 5535, makes the filing of their claims timely. I noted earlier that I did not believe that the state's savings clause could affect a federal limitations period and was thus irrelevant to the timeliness of A-plaintiffs' § 10(b) claim. Similarly, I am not certain that Pennsylvania's savings clause has much bearing

on this court's inquiry into the timeliness of non-federal claims initially asserted in a court in another state. A number of courts have declined to apply a state's saving clause to actions initiated in a different state. *See Mizokami Bros. of Ariz. v. Mobay Chemical Corp.*, 798 F.2d 1196 (8th Cir.1986) (concerning Missouri's savings statute); *King v. Nashua Corp.*, 763 F.2d 332 (8th Cir.1985) (Missouri law); *Graham v. Ferguson*, 593 F.2d 764 (6th Cir.1979) (Tennessee law); *Andrew v. Bendix Corp.*, 452 F.2d 961 (6th Cir.1971), *cert. denied*, 406 U.S. 920, 92 S.Ct. 1773, 32 L.Ed.2d 119 (1972) (Ohio law); *Jones v. Mid America Expositions, Inc.*, 708 F.Supp. 173 (S.D.Ohio 1989) (Georgia law). *But see Prince v. Leesona Corp. Inc.*, 720 F.2d 1166 (10th Cir.1983) (Kansas law); *Allen v. Greyhound Lines*, 656 F.2d 418 (9th Cir.1981) (Montana law); *Stare v. Pearcy*, 617 F.2d 43 (4th Cir.1980) (West Virginia law). While the Pennsylvania Supreme Court has not addressed the issue directly, the Commonwealth Court stated in dictum that "§ 5535 governs the termination of civil actions in Pennsylvania's unified judicial system which consists solely of courts and district justices in Pennsylvania." *Duquesne Light Co. v. Penn. Public Utility Commission ("PUC")*, 148 Pa.Cmwlth. 378, 611 A.2d 370, 373 n. 3 (1992) (finding § 5535 not applicable to case initially filed in PUC) (citing *Pennsylvania Bd. of Probation and Parole v. Baker*, 82 Pa.Cmwlth. 86, 474 A.2d 415 (1984)).

For purposes of argument, though, I will assume that Pennsylvania's highest court would hold that § 5535 can apply to actions commenced in another state. Of the courts agreeing with this conclusion, each has remarked that the validity of its holding assumes that the application of the savings clause does not conflict with the forum state's statute of limitations. As the Fourth Circuit explained:

Of course, there would be a problem if the statute of limitations of the state of first filing was longer than that of the state of second filing and the period of the latter statute had run when the foreign action was first filed, but that is a problem which should be capable of resolution under principles of conflict of laws, or, more likely, *by construing the savings statute as applying only when the first action was commenced within the period limited by the statute of the forum state.*

*Stare*, 617 F.2d at 45 (emphasis added). *See also Prince*, 720 F.2d at 1169 (allowing no more delay through application of savings statute than if action first filed in forum state); *Allen*, 656 F.2d at 424; *DeLuca v. Atlantic Refining Co.*, 176 F.2d 421, 422 (2d Cir.1949) (application of New York savings statute contingent on first action being filed within New York limitations period). Otherwise, a plaintiff could circumvent Pennsylvania's statute of limitations by "[searching] the jurisdictions of all fifty states for one with a statute of limitations long enough to save his cause of action, fil[ing] his case there without any possibility of personal jurisdiction, then suffer[ing] dismissal of that case for the purpose of refiling it" in Pennsylvania using § 5535. *Jones*, 708 F.Supp. at 176–77. To the extent that all the courts considering the issue tend to agree, I believe that the Pennsylvania Supreme Court—assuming it finds § 5535 applicable to cases commenced outside the state—would accordingly interpret § 5535 to incorporate Pennsylvania's statute of limitations. Thus, were this court to apply § 5535, the question is whether plaintiffs' claims were filed in New York and in Illinois within Pennsylvania's statutes of limitation.

Under Pennsylvania law, the limitations period for fraud, negligence and breach of fiduciary duty claims is two years. 42 Pa. Cons.Stat.Ann. § 5524. Defendants suggest that the statute of limitations proceeded to run after plaintiffs purchased their security interests in 1984, and thus the claims expired in 1986—years before the New York or Illinois actions were commenced. Plaintiffs respond that the statute of limitations was tolled on the claims. Plaintiffs proffer two theories in support of their response: first, plaintiffs argue for a sort of "fiduciary exception" to Pennsylvania's discovery rule; and second, plaintiffs claim that the statute of limitations was tolled for each of these claims by the equitable tolling doctrine of fraudulent concealment. I will address each in turn.

### 1. *The discovery rule*

■ In general, the accrual of a cause of action under Pennsylvania law—and the time when the limitations period begins to run—is determined by a discovery rule. As stated by the Third Circuit:

The discovery rule tolls the statute of limitations when a plaintiff, despite the exercise of due diligence, is unable to know of the existence of the injury and its cause.... Under the most recent restatement of the discovery rule, the statute of limitations begins to run as soon as "the plaintiff knows, or reasonably should know, (1) that he has been injured, and (2) that his injury has been caused by another party's conduct."

*Bohus v. Beloff,* 950 F.2d 919, 924 (3d Cir. 1991) (quoting *Cathcart v. Keene Indus. Insulation,* 324 Pa.Super. 123, 471 A.2d 493, 500 (1984) (footnote omitted)). According to plaintiffs, the above discovery rule varies somewhat where the defendant is plaintiff's fiduciary. In that situation, plaintiffs argue, the cause of action does not accrue until plaintiffs have *actual* knowledge of the injury. Plaintiffs contend that they did not actually know of defendants' wrongdoing until the lawsuits were filed in New York and Illinois. See Plaintiffs' Opp. at 26.

■ However, the Third Circuit has not recognized an exception to the discovery rule in the fiduciary-defendant context.[29] Rather, the court continues to disavow an actual knowledge standard, maintaining that:

the "polestar" of the discovery rule is not the plaintiff's actual knowledge, but rather "whether the knowledge was known, or through the exercise of diligence, knowable to [the] plaintiff."

*Bohus,* 950 F.2d at 925 (quoting *O'Brien v. Eli Lilly & Co.,* 668 F.2d 704, 711 (3d Cir. 1981)).[30]

As support for their "fiduciary exception," plaintiffs cite *Schwartz v. Pierucci,* 60 B.R.

397, 403 (E.D.Pa.1986), in which the court stated:

Where a fiduciary commits an act of fraud against his principal, the statute of limitations will be tolled, since the very position the fiduciary is in, prohibits the principal from uncovering the fraud. Furthermore, the fiduciary, because of his position of trust, would have an affirmative duty to the principal to disclose the fraud. Absent a disclosure, the fiduciary commits an act of continual covering up of the fraud.

The *Schwartz* case is both inapposite and contrary to plaintiffs' argument. It is inapposite because the decision concerns the summary judgment motion of a *non-fiduciary* defendant. The court's holding, when read in context, is that the statute of limitations on the plaintiff's claims against the non-fiduciary defendant was tolled in light of the fiduciary defendants' conduct. The court simply did not address the tolling of the limitations periods with respect to the claims against the fiduciary defendants. Moreover, the *Schwartz* decision is contrary to plaintiffs' contention to the extent that the court ultimately affirms the discovery rule as stated in *Cathcart.* The *Schwartz* court concludes by recognizing that a question of fact remained as to whether certain events triggered the plaintiff's duty to inquire and thus commenced the statute of limitations. *Schwartz,* 60 B.R. at 403.

So, even assuming defendants owed a fiduciary duty to plaintiffs, the discovery rule as stated in *Bohus* applies and this court is left to determine for statute of limitations purposes when plaintiffs knew or, exercising reasonable diligence, should have known of the injury inflicted upon them and the cause of that injury. A cause of action accrues when "a party has a legal right to institute suit and can maintain a successful action." *ITG, Inc. v. Price Waterhouse,* 697 F.Supp. 867, 870–71 (E.D.Pa.1988) (citing *Kapil v. Association of Pennsylvania State College and University*

---

**29.** *But see Nerman v. Alexander Grant & Co.,* 926 F.2d 717, 721 (8th Cir.1991) (using actual knowledge standard in case of fiduciary defendant).

**30.** Plaintiffs argue that in *Bohus* the Third Circuit implicitly accepted the actual knowledge standard by articulating a "known or knowable"

test. Plaintiffs' Opp. at 24. But plaintiffs misquote the court. The standard articulated by the court was not "known or knowable," Plaintiffs' Opp. at 24, but "known, or *through the exercise of diligence,* knowable." *Bohus,* 950 F.2d at 925 (emphasis added).

*Faculties,* 504 Pa. 92, 470 A.2d 482 (1983)).[31] I will address the claims arising out of the Sovereign and Crestwood Partnerships separately.

 The state common law claims against the Sovereign Partnership emanate from the same principal event: the Sovereign Partnership's allegedly false promise to construct the project for a fixed price of $10,-500,000. As discussed above, plaintiffs' fraud claim centers on the defendants' alleged misrepresentations and omissions regarding its assurance that it would renovate the Sovereign project at a fixed cost. Similarly, plaintiffs' breach of fiduciary duty claim centers on defendants' supposed failure to stay within the certain construction price and the consequent assumption of greater debt by the Sovereign Partnership. Plaintiffs have alleged that defendants breached their fiduciary duties by: failing to enforce the construction contract; causing the company to incur $18,000,000 in debt in order to repay defendants' advances to the partnership; taking on this debt even though it placed the partnership on the brink of foreclosure; not permitting the limited partners to vote on the refinancing; and misrepresenting to the investors both the cost of construction and the seriousness of the Sovereign Partnership's financial situation in light of the increased debt. Am. Comp. at ¶ 94. Plaintiffs have not articulated their grounds for negligence against defendants, although presumably plaintiffs are claiming that defendants acted negligently in all the ways they acted fraudulently or in breach of their fiduciary duty.

From plaintiffs' own statement of the facts, plaintiffs learned by 1987 that the construction costs would be substantially higher than had been represented and that defendants would not enforce the fixed price provision of the contract against the contractor. Am. Comp. at ¶ 30. Plaintiffs also learned in 1987 that because of the increased construction costs, the Sovereign Partnership needed to enlarge its loan by 50% from $12,000,000 to

$18,000,000. Am. Comp. at ¶¶ 30–31. By plaintiffs' own account, then, in 1987 plaintiffs were cognizant of the alleged broken promise and 50% increase in debt forming the bases of (1) their claim of fraud and (2) much of their claims of breach of fiduciary duty and negligence.

Plaintiffs state that they learned of defendants' fraud in July of 1989 when defendants informed the limited partnership of the weak financial condition of the Sovereign Partnership. More accurately, plaintiffs learned in 1989 of additional grounds for raising the state law claims against the Sovereign defendants. Plaintiffs' supposed ignorance in 1987 of the "dire" financial straights of the Sovereign Partnership had no bearing on the viability of plaintiffs' claims based either on the allegedly broken promise regarding construction costs or on defendants' assumption of increased debt for improper reasons and without investor consent.

Thus, A-plaintiffs' knew or, exercising reasonable diligence, should have known of the injury giving rise to their state law claims in 1987, giving A-plaintiffs until 1989 to file their claims. A-plaintiffs did not commence their New York action until February 1990. Hence, the state law claims against the Sovereign defendants are time-barred under the discovery rule.

 As for the claims arising from the Crestwood Partnership, except for providing the date the Crestwood PPM was distributed, plaintiffs have not provided the dates of any communications between the parties related to the progress of the Crestwood Partnership. It is well established that a plaintiff must plead sufficient facts to show that his claim is timely brought. *See, e.g. Alfaro,* 606 F.Supp. at 1111–12; *Kramer v. Scientific Control Corp.,* 352 F.Supp. 1175, 1176 (E.D.Pa.1973). Plaintiffs have not alleged enough facts in their amended complaint based upon which this court could conclude when plaintiffs knew or, through due dili-

---

31. The existence of a fiduciary relationship is relevant to the question of when a cause of action accrued. Because of a fiduciary's unique position of trust, the presence of a fiduciary relationship would be pertinent to the question of when a plaintiff's duty to investigate arose. *See*

*Schwartz v. Pierucci,* 60 B.R. 397, 403 (E.D.Pa. 1986); *Insurance Consultants of Amer. v. Southeastern Insur.,* 746 F.Supp. 390, 410–411 (D.N.J. 1990) (citing *Elysian Federal Savings v. First Interregional Equity,* 713 F.Supp. 737, 745–46 (D.N.J.1989)).

gence, should have known of the claims against defendants. *See Kramer,* 352 F.Supp. at 1176. Without these facts, this court cannot find under the discovery rule that the claims were filed within the statute of limitations.

Unless the state law claims regarding the Sovereign or Crestwood Partnerships are otherwise tolled by the doctrine of fraudulent concealment as argued by plaintiffs, the claims will be dismissed as time-barred.

### 2. *Fraudulent concealment*

■ Plaintiffs have argued that the limitations period on their state claims were tolled by defendants' acts of fraudulent concealment. In *Bohus,* the Third Circuit explained the doctrine as follows:

> [The] doctrine [of fraudulent concealment] tolls the statute of limitations where "through fraud or concealment the defendant causes the plaintiff to relax his vigilance or deviate from the right of inquiry." *Ciccarelli v. Carey Can. Mines, Ltd,* 757 F.2d 548, 556 (3d Cir.1985). Fraudulent concealment may be intentional or unintentional; however, "mere mistake, misunderstanding, or lack of knowledge is insufficient." *Nesbitt v. Erie Coach Co.,* 416 Pa. 89, 204 A.2d 473 (1964). There must be an affirmative and independent act of concealment that would divert or mislead the plaintiff from discovering the injury. *Gee [v. CBS, Inc.],* 471 F.Supp. 600, 623 (E.D.Pa.), *aff'd,* 612 F.2d 572 (3d Cir.1979).

*Bohus,* 950 F.2d at 925. As with all allegations of fraud, the claim of fraudulent concealment must be pled with particularity pursuant to Fed.R.Civ.P. 9(b). *Alfaro,* 606 F.Supp. at 1109–1110; *Gee v. CBS,* 471 F.Supp. 600, 624 (E.D.Pa.), *aff'd,* 612 F.2d 572 (3d Cir.1979).

With respect to the Sovereign Partnership, plaintiffs assert in their response to defendants' motion to dismiss that the Sovereign defendants lured plaintiffs into lack of concern through a series of misrepresentations. Unfortunately for plaintiffs, though, they neglect to allege fraudulent concealment or any sort of concealment by defendants in their amended complaint. Defendants, therefore, can not be said to be on notice from the pleadings that defendants fraudulently concealed the injury to plaintiffs.

■ The amended complaint does contain allegations that the Crestwood defendants fraudulently concealed plaintiffs' injury. As discussed in part IV.B.2, plaintiffs contend that, subsequent to the initial fraud within the project's financial projections, defendants continued to misrepresent the financial position of the Crestwood Partnership "over the life of the investment." Am. Comp. at ¶ 57. According to plaintiffs, defendants provided status reports that "failed to paint a true picture of the actual status of the property and falsely attributed any deficiencies to other factors," such as the original property manager and the increased availability of apartments in Mesa. Am. Comp. at ¶¶ 58–60. Referring to the above conduct, plaintiffs claim:

> 63. These defendants intentionally and fraudulently committed the above acts to conceal from the Crestwood Apt. plaintiffs the true facts and the fraudulent nature of their investments.

> 64. The fraudulent concealment tolled the running of any applicable statute of limitations until the earliest date when the plaintiffs had notice that a fraudulent scheme existed.

In part IV.B.2, I concluded that the above allegations of fraudulent conduct were not sufficient to state a claim of fraud under Fed.R.Civ.P. 9(b). Necessarily, then, they are not sufficient to support a claim of fraudulent concealment and thus to toll the applicable statute of limitations.

Since plaintiffs' have not pled fraudulent concealment with the requisite specificity, plaintiffs' state claims will be dismissed as time-barred.

### E. Motion to Strike Plaintiffs' Jury Demand

■ Plaintiffs have made a demand for a jury trial with their amended complaint. However, Section 12.7 of the Sovereign Partnership Agreement states:

> By entering into this Agreement, each Partner waives any right to trial by jury

with respect to any matter or dispute arising out of this Partnership Agreement. Motion to Dismiss at 63; Ex. 4, Ex. B at 43. The Crestwood Partnership Agreement contains an identical waiver. Ex. 7, Ex. B, at 48–49. Accordingly, defendants argue that plaintiffs' request for a jury trial should be stricken as waived.

Plaintiffs suggest that this court should not enforce the waiver in light of plaintiffs' allegation that they were fraudulently induced to sign the contracts. While it is true that courts are as a general matter strongly protective of a litigant's constitutionally guaranteed right to a jury, *see e.g. In re Jackson,* 118 B.R. 243 (E.D.Pa.1990), courts nonetheless have upheld waiver of the right to a jury trial where the waiver is knowing and voluntary. *See, e.g. Telum,* 859 F.2d at 837, *Leasing Service Corp. v. Crane,* 804 F.2d 828 (4th Cir.1986); *Bellmore v. Mobil Oil Corp.,* 783 F.2d 300 (2d Cir.1986).

The Tenth Circuit has considered whether allegations of fraudulent inducement invalidate jury waiver provisions. *See Telum, Inc. v. E.F. Hutton Credit Corp.,* 859 F.2d 835, 837–38 (10th Cir.1988), *cert. denied,* 490 U.S. 1021, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989). In *Telum,* plaintiff signed a lease agreement with defendant that included a jury waiver. Plaintiff filed a suit against defendant to rescind the lease on numerous grounds, including fraudulent inducement to enter the contract. Despite the jury waiver provision, plaintiff made a jury demand and the district court granted it. On appeal, the Tenth Circuit reversed, comparing the jury waiver provision to an arbitration provision:

> Both the United States Supreme Court and this court have held that allegations of fraud in the inducement relating specifically to an arbitration provision may suspend application of that provision. Allegations of fraud in the inducement of the contract generally, however, have been held not to affect the agreement to arbitrate. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 403–04, 87 S.Ct. 1801, 1805–06, 18 L.Ed.2d 1270 (1967); *Meyer v. Dans un Jardin, S.A.,* 816 F.2d 533, 538 (10th Cir.1987). This analogy is especially appropriate here because sub-

> mission of a case to arbitration involves a greater compromise of procedural protections than does the waiver of the right to trial by jury. *See Hart v. Orion Ins. Co.,* 453 F.2d 1358, 1361 (10th Cir.1971).... For these reasons, we hold that the trial judge erred in ruling that general allegations of fraud are sufficient to invalidate a jury waiver provision.

*Telum,* 859 F.2d at 837–38.

I find the Tenth Circuit's view of the matter sound. In this case, plaintiffs' general allegation of fraud in no way suggests that plaintiffs' agreement to waive the right to a jury trial was involuntary or not knowing. The jury waiver provisions in both the Sovereign PPM and Crestwood PPM were clear and conspicuous. And nothing in the amended complaint suggests that plaintiffs were not sufficiently sophisticated to understand the waiver provisions.

Since plaintiffs' civil RICO claim—the one claim remaining—involves a "matter or dispute arising out of this Partnership Agreement," I find that plaintiffs' right to a jury trial has been waived.

### ORDER

For the reasons outlined in the accompanying Memorandum, it is hereby ORDERED that:

1) Defendants' Motion to Dismiss is GRANTED as to claim I;

2) Defendants' Motion to Dismiss is GRANTED as to claim II with respect to plaintiffs' 18 U.S.C. § 1962(a) claim, but is DENIED as to claim II in all other respects;

3) Defendants' Motion to Dismiss is GRANTED as to plaintiffs' state law claims (claims III, V, and VI); and

4) Defendants' request that plaintiffs' demand for a jury trial be struck is GRANTED.